**SEALED**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

**FILED**

AUG 12 2022

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, and [UNDER SEAL], | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | No. **22 CV - 354 TCK - JFJ** |
| | ) | |
| v. | ) | |
| | ) | **FILED IN CAMERA AND** |
| [UNDER SEAL] | ) | **UNDER SEAL** |
| | ) | **JURY TRIAL DEMAND** |
| Defendants. | ) | |

**COMPLAINT**

Gaylon C. Hayes

Oklahoma Bar No. 14492

Hayes Legal Group, P.C.

6805 S. Western, Suite 500

Oklahoma City, OK 73139

Telephone: (405) 616-5045

Fax: (405) 616-5062

E-Mail: gaylon@ hhhlawfirm.com

        whitney@hhhlawfirm.com

*Attorney For Plaintiffs*

# UNDER SEAL

**Table of Contents**

I. INTRODUCTION..................................................................................1

II. JURISDICTION AND VENUE ..........................................................3

III. PARTIES............................................................................................3

   A.   Defendants...................................................................................3

   B.   Relator .......................................................................................5

IV. FACTUAL ALLEGATIONS.............................................................5

V.    LEGAL FRAMEWORK....................................................................6

A.   Liability Attaches for Seeking Funds That Provider is Statutorily Prohibited From Receiving........................................................................................12

B.   Civil Penalties...............................................................................19

C.   Materiality....................................................................................21

D.   Kickbacks.....................................................................................31

E.   Oklahoma Medicaid False Claims Act............................................32

F.   Retaliation Under the Federal False Claims Act................................34

VI. CLAIMS...........................................................................................34

   COUNT 1: False Claims Submitted Under 31 U.S.C. § 3729(a)(l)(A) .............34

   COUNT 2: False Records Under 31 U.S.C. § 3729(a)(l)(B) .............................35

   COUNT 3: Conspiracy Under 31 U.S.C. § 3729(a)(l)(C) .................................36

   COUNT 4: Retention Of Overpayments Under 31 U.S.C. § 3729(a)(l)(G) .....37

   COUNT 5: Retaliation Under 31 U.S.C. § 3730(b)........................................38

   COUNT 6: Retaliation Under 63 O.S. § 5053.5..............................................38

   COUNT 7: False Claims Submitted Under 63 OS 5053 et seq.........................39

VII. REQUEST FOR TRIAL BY JURY...............................................................40

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

1) THE UNITED STATES OF
AMERICA Ex Rel                              )
2) JENNIFER YOUNG                           )
And                                         )
3) ON BEHALF OF THE STATE OF OKLAHOMA        )
                                            )
Plaintiffs,                                 )    No.
            v.                              )    FILED IN CAMERA AND
                                            )        UNDER SEAL
1) URGENT CARE OF CHECOTAH, PLLC.,          )
2) URGENT CARE OF MUSKOGEE, PLLC.,          )
3) MUSKOGEE MEDICAL CARE, PLLC.,            )
4) DR. AZHAR SHAKEEL, M.D., aka             )
    PASHA SHAKEEL                           )
Defendants.                                 )    JURY TRIAL DEMAND

**COMPLAINT**

COMES NOW, Jennifer Young ("Relator"), and files this Complaint on behalf of

the United States of America ("USA") and the State of Oklahoma against Urgent Care

of Checotah, PLLC, Urgent Care of Muskogee, PLLC, Muskogee Medical Care, PLLC,

and Dr. Azhar Shakeel, aka Pasha Shakeel (collectively, "Defendants"), and alleges the

following:

**I. INTRODUCTION**

1.      This action and Relator's claims arise pursuant to the Federal False Claims

        Act ("FCA"), 31 USC § 3729 *et seq.*, and state pharmacy statutes, rules, and

        regulations. The FCA and each of the FCA prohibited Acts authorize

private persons to bring a civil action for the person and the applicable governmental entity against a person who commits one or more acts in violation of the particular false claims statute. Remedies include the recovery of civil penalties for each false claim violation and a multiple of damages based on a single damages multiplier (e.g., treble damages and civil penalties under the FCA). As an award, the Relator is entitled to receive a percentage of the proceeds of the action or settlement of the claim(s) and an award against the Defendant(s) for reasonable expenses, plus attorney fees and costs.

2. Defendants' unlawful acts in violation of the FCA concerning Defendants' submission of false claims to Federal health care programs.

3. That said Defendants, and each of them, worked together to apply for federal funds, which they were not eligible to receive due to failure to comply with the rules and regulations of the federal government, CMS, state laws and statutes, state pharmacy regulations, and breach of the conditions and certifications present to being eligible to receive funds, and engaging in self-referrals prior to UPC coding, which is also prohibited.

4. Relator, an employee, warned the Defendants of the wrongful conduct and the fact that it was fraud to report that someone else other than the person performing the task performed the work.

## II. JURISDICTION AND VENUE

6.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3730(b). This court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a).

7.   Venue in this Judicial District is appropriate under 31 U.S.C. § 3732(a) because one or more of the Defendants transact or have transacted business in this Judicial District.

8.   Relator believes there has been no public disclosure of the allegations and transactions on which this action is based; but should the question arise, and should the court determine otherwise, the Relator is an original source of the information on which the allegations in this complaint are based, as defined in FCA §3730(e)(4)(B). As a member of the Defendant's staff, Relator has knowledge and information which is not publicly available.

## III. PARTIES

### A. Defendants

9.   a. Muskogee Medical Care, PLLC is located at 2900 N Main Street, Muskogee, OK 74001-4078, with an NPI number of 1629368105. This business is open to the public, accepts and applies for Medicare, Medicaid, Tri-Care and all other federally funded health care programs, including special appropriated funds for COVID-19 testing. All accounts receivable and payable are processed by or through the Relator for payment from the federal and state governments.

b. Urgent Care of Checotah is located at 1103 W Gentry Avenue, Suite A, Checotah, OK 74426-2051, with an NPI number of 1548786569. This business is open to the public, accepts and applies for Medicare, Medicaid, Tri-Care and all other federally funded health care programs, including special appropriated funds for COVID-19 testing. All accounts receivable and payable are processed by or through the Relator for payment from the federal and state governments.

c. Urgent Care of Muskogee is located at 384 S. 33rd Street, Suite D, Muskogee, OK 74401-5065, with an NPI number of 1740678622. This business is open to the public, accepts and applies for Medicare, Medicaid, Tri-Care and all other federally funded health care programs, including special appropriated funds for COVID-19 testing. All accounts receivable and payable process by or through the Relator for payment from the federal and state governments.

d. Dr. Azhar Shakeel, private MD, lives in Tulsa, OK and has houses at four locations in Tulsa, Oklahoma. He operates under NPI number 1114124674, and is also known as Pasha Shakeel. He is the owner and CEO of all the other Defendant companies, which are open to the public, accepts and applies for Medicare, Medicaid, Tri-Care and all other federally funded health care programs, including special appropriated funds for COVID-19 testing. All accounts receivable and payable are processed by or through the Relator for payment from the federal and state governments. This Defendant is the direct supervisor of the Relator in her

capacity as patient coordinator for these Defendant companies.

e.   The Defendants: Doctor Shakeel (aka Pasha Shakeel), Urgent Care Of Checotah, PLLC., Urgent Care Of Muskogee, PLLC., and Muskogee Medical Care, PLLC.; each corporation we have from the Secretary of State, there are at least three.

**B. Relator**

10.   Relator Jennifer Young (**"Relator"**) is a citizen of the United States and a resident of the State of Oklahoma. Relator began working for the Defendant Urgent Care Checotah in April of 2018. She received on the job training from the Defendant and received instruction on their unlawful coding, self-referrals, and misuse of the Doctors signature. Relator handled both accounts payable and accounts receivable and submitted claims to the federal and state governments.

## IV. FACTUAL ALLEGATIONS AND AVERTMENTS

11.   The Relator began working for the Defendant around April 2018. She learned the job through on the job training. As she learned more, she learned the proper procedures and came to the job with the moral understanding that one should report things that were not true, or were actually false, or were in a patient file to get a higher reimbursement, to the federal government. The deception is aided by the computer system. On a normal day, at all the clinics, medical assistants see patients and perform swabs for a variety of medical appointments, including COVID-19 testing. The only process performed is

this procedure, with a brief medical history. After the swab, the patient leaves the clinic. Patients receive a phone call with the results of the test. After this is done, the staff signs off in the computer system and after a short time, then shortly after signs back in the system as Doctor Shakeel (under his name), as if he was viewing the new patient's chart for Medicare and type notes as if they were a new patient, then sign the doctor off. This is done when Dr. Shakeel is not in the clinic at all. Attached as Exhibit 1 is a list of redacted names of patients individually to provide particularity to satisfy Rule 9 demands.

Doctor Shakeel has instructed to bill Medicare and Medicaid patients as if they were making an initial new patient visit instead of a mere COVID-19 test. Exhibit 2 is the identity of a specific patient that was seen by a specific APRN and billed as being seen by Dr. Shakeel. All documents are redacted to protect the innocent and the medical patient's privacy.

Doctor Shakeel also has the Physicians Assistants, Nurse Practitioners, and Medical Assistants sign charts as if he saw those patients himself, regardless of what they are being seen for. This is to have the government billed at his rate instead of the lower rate for the person actually seeing the patient.

## IV.  LEGAL FRAMEWORK

12.     The Relators claims center around several violations of law which constitute

violations of the False Claims Act (FCA), while others are activities that rise to a level of liability under FCA because of falsely implied certifications and the falsity of the claims made. The Relator does not presume to know when the scheme was hatched in the minds of the Defendant, but she has learned that it began approximately four and a half years ago. The Defendant began the scheme with falsifying the identity of the individual, the Doctor or subsequent staff, that is falsely represented to the federal government as being the individual that performed the procedure. The scheme is to have a staff member perform a test, exam, vaccine, or any other procedure and then report it to Medicare, Medicaid, or any other healthcare providers as having been performed by the physician in order to receive the greater reimbursement. In other words, upcoding everything that was done as if the MD Shakeel had performed everything at all three clinics.

With the pandemic at hand, the Defendant started doing testing for COVID-19. The Defendant decided to bill each Medicare patient who wanted a test for COVID-19 as if they were a new patient and billed them for a full work-up, which they did not receive, and to represent that the doctor had performed the administration of the test, thereby falsifying who performed who performed the function and what was done. In other words, the Defendant failed to provide services as billed, which is also a violation of FCA.

13.     Implied certification is a theory of liability.

14.     The first case of this kind was upheld in 1993, when Judge Carl B. Rubin, United States District Court Judge for the Southern District of Ohio, denied Defendants' motion

to dismiss in *United States ex rel. Roy v. Anthony*, which alleged that claims submitted

pursuant to a violation of the Medicare Fraud & Abuse/ Anti-Kickback statute[1] give rise

to False Claims Act liability, without regard to whether the service itself was allowable,

because the defendants had violated their agreement to abide by all Medicare statutes and

regulations as a condition of participation in the Medicare program.[2] In the more than

twenty years since that decision, courts across jurisdictions have agreed that schemes in

violation of Anti-Kickback and Stark laws to induce payment from the United States

create liability under the False Claims Act.[3]

   Two of the most prominent of those cases are *United States ex rel. Pogue v.*

*American Healthcorp., Inc.*,[4] and *United States ex rel. Thompson v. Columbia/HCA*

*Healthcare Corp*[5]. In *Pogue*, the Middle District of Tennessee Court found that the

Defendants' continued participation in the Medicare program constituted an "implied

---

[1] 42 U.S.C. § 1320a-7b(b).

[2] *United States ex rel. Roy v. Anthony*, 914 F. Supp. 1504 (S.D. Ohio 1994).

[3] *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir. 1997), *on remand*, 20 F. Supp. 2d 1017 (S.D. Tex. 1998); *United States ex rel. Bidani v. Lewis*, 264 F. Supp. 2d 612, 614 (N.D. Ill. 2003), *quoting Mikes v. Straus*, 84 F. Supp. 2d 427, 434 (S.D.N.Y. 1999); *United States ex rel. Barrett v. Columbia/ HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 32-33 (D. D.C. 2003); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. Of Am., Inc.*, 238 F. Supp. 2d 258 (D. D.C. 2002); *United States ex rel. Goodstein v. McLaran Regional Medical Center*, 2001 U.S. Dist. LEXIS 2917 (E.D. Mich. 2001); *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 43 (D. Mass. 2000); *United States ex rel. Bidani v. Lewis*, 1998 U.S. Dist. LEXIS 20647 *29-30 (N.D. Ill. 1999); *Gublo v. Novacare, Inc.*, 62 F. Supp. 2d 347 (D. Mass. 1999); *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39 (D. Mass. 2001); *United States ex rel. Showell v. Philadelphia AFL*, 2000 U.S. Dist. LEXIS 4960 (E.D. Pa. 2000); *United States ex rel. Pogue v. American Healthcorp., Inc.*, 914 F. Supp. 1507 (M.D. Tenn.); *United States ex rel. Roy v. Anthony*, 914 F. Supp. 1504 (S.D. Ohio 1994). *Accord United States v. DBB, Inc., G.S. Care Corp.*, 180 F.3d 1277 (11th Cir. 1999) (freezing assets of defendants with conduct near identical to that alleged here); *United States v. Killough*, 848 F.2d 1523, 1525-1526 (11th Cir. 1988) (criminal violations which cause the Government to make improper payments to contractors violate the False Claims Act); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.Supp. 2d 1017 (S.D. Tex. 1998).

[4] 914 F. Supp. 1507 (M.D. Tenn. 1996), *aff'd*, 238 F. Supp. 2d 258 (D. D.C. 2002).

[5] *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017 (S.D. Tex. 1998).

certification that [it] will abide by and adhere to all statutes, rules, and regulations governing that program."[6]

The Middle District of Tennessee decision in *Pogue* was reaffirmed by the District of Columbia.[7] After the 1996 decision, *Pogue* was transferred from the Middle District of Tennessee to the District of Columbia as part of the Multi-District Litigation against HCA- the Healthcare Company, whose wholly owned subsidiary, West Paces Medical Center, is a Pogue defendant. HCA West Paces' co-defendant, Diabetes Treatment Centers of America ("DTCA") moved the D.C. Court for judgment on the pleadings, based on its theory that intervening law- including the decisions in *United States ex rel. Siewick v. Jamieson Science and Engineering, Inc.*[8] and *United States ex rel. Straus*[9] required the Court to reconsider and reject the Middle District of Tennessee's 1996 determination that the defendants' violations of anti-kickback and self-referral laws rendered the claims false. The D.C. Court declined to do so, instead reaffirming the 1996 decision as the law of the case and accepting it as the law of the District of Columbia.[10] The Court specifically rejected DTCA's contention that implied certification had been rejected by the courts.[11]

---

[6] *Pogue*, 914 F. Supp. At 1509.
[7] *Id.*
[8] *Siewick*, 341 U.S. App. D.C. 459, 214 F.3d 1372 (D.C. Cir. 2000).
[9] *Straus*, 274 F.3d 687 (2d Cir. 2001).
[10] *Pogue*, 238 F. Supp. 2d 258, 262-263.
[11] The Court noted that the only court to reject implied certification was the District Court in *United States ex rel. Barmak v. Sutter Corp.*, 2002 U.S. Dist. LEXIS 8509 (S.D.N.Y. 2002), "which did so in dicta on a matter not fully briefed and not squarely before it." *Pogue*, 238 F. Supp. 2d at 266.

Page | 9

Instead, the D.C. Court found the decisions cited by DTCA to be fully consistent with the implied certification theory adopted in *Pogue* that certification can be implied from silence when compliance with the laws at issue "would affect the Government decision to pay."[12] In one of the most detailed analyses of the implied certification theory since the 1998 decision in *U.S. ex rel. Thompson v. Columbia/HCA*,[13] the Court affirmatively upheld that "violations of the Anti-Kickback and Stark laws can support a claim under the FCA..."[14]

In *Thompson*, the Northern District of Texas Court held both that the mere submission of claims for payment statutorily prohibited by the self-referral Stark statute[15] and the submission of claims with false certification of compliance with Anti-Kickback and self-referral laws violated the False Claims Act.[16] The Northern District of Illinois

---

[12] *Pogue*, 238 F. Supp. 2d at 263-265. The District of Columbia's conception of "implied certification" has principled limits, which was demonstrated shortly after the Pogue decision. In *United States ex rel. Ortega v Columbia Healthcare, Inc.*, 240 F. Supp. 2d 8, 20 (D. D.C. 2003), the same court dismissed False Claims Act allegations premised on a hospital's noncompliance with the Joint Commissions on Accreditation of Healthcare Organizations (JCAHO) because: "Compliance with the Medicare laws and the regulations promulgated under them is a requirement to participate in Medicare, JCAHO certification is not." In other words, there was no nexus between JCAHO certification and Medicare payment.

[13] *Thompson*, 20 F. Supp. 2d 1017 (S.D. Tex. 1998).

[14] *Pogue*, 238 F. Supp. 2d at 266. The Court examined such decisions as *United States v. TDC Management Corp.*, 288 F.3d 421 (D.C. Cir. 2002), Ab-Tech Constr. V. United States, 31 Fed. Cl. 429 (1994), and *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999), and concluded that even the strictest construction of implied certification theory (such as that found in *Mikes*) is "in line with [these] courts' requirement that compliance with the statute or regulation must be of such importance that noncompliance would influence the government's decision to pay." *Id.*, 238 F. Supp. 2d at 265-266. In a companion case the following year, the *Pogue* Court reiterated this view. *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 32-33 (D. D.C. 2003).

[15] 42 U.S.C. § 1395.

[16] Thompson is the most detailed exposition thus far of the interplay between the Medicare requirements and violations of the False Claims Act: PPS providers receive interim payments based on claims they submit throughout the year on a per-patient basis for every episode of care. These payments, however, are conditioned on the submission of an annual cost report- the final accounting which itemizes all of the provider's costs for that year and results in a claim for the total amount of program reimbursement. Failure to submit a cost report can result in all interim payments during the cost period being deemed overpayments. 42 U.S.C. § 1395(g). The cost report contains

shares this view, holding first that claims for payment are implied false "where the defendant's certification of compliance with the statutes regulations in question is a condition of receiving funds from the Government."[17] As to whether compliance with the Anti-Kickback Act is a condition of receiving Medicare funds, the *Bidani* Court found the answer obvious: "Compliance with the [Anti-Kickback Act] is thus central to the reimbursement plan of Medicare. To state otherwise would be to allow participation and reimbursement for supplies purchased illegally only because the claimant had the luck of not being caught and convicted in the first place."[18] Courts have long held that contractors are liable under the False Claims Act for failure to "turn square corners" with the United States without regard to the existence of affirmative certifications.[19] In the Medicare context, False Claims Act liability routinely has been upheld for claims

---

a certification by the provider that "this report and statement are true, correct, complete" and that "the services identified in this cost report were provided in compliance with such laws and regulations." 42 CFR § 413.24(f)(4)(iv). False certifications on cost reports violate the False Claims Act. *Thompson*, 20 F. Supp. 2d at 1046, 1049. *Thompson* recognized that HHHS conditions the retention of payment as well as a provider's continued eligibility in the program on the accuracy of the cost reports, and cited the express language in the applicable statutes and regulations, as well as to the Declaration of David Goldberg, an acting chief of the Provider Audit Operations Branch at HHS, submitted by the United States. *Id.*, 20 F. Supp. 2d at 1042, *citing* Declaration of Goldberg.

[17] *United States ex rel. Bidani v. Lewis*, 264 F. Supp. 2d 612, 614 (N.D. Ill. 2003), *quoting Mikes v. Straus*, 84 F. Supp. 2d 427, 434) S.D.N.Y. 1999).

[18] *Bidani*, 264 F. Supp. 2d at 616.

[19] United States ex rel. A+ Homecare, Inc. v. Medshares Mgm't Group, Inc., 400 F.3d 428, 446 (6th Cir.), cert. denied, 546 U.S. 1063 (2005); United States ex rel. Augustine v. Century Health Servs, Inc., 289 F.3d 409 (6th Cir. 2002); United States ex rel. Varljen v. Cleveland Gear Co., 250 F.3d 426, 430 (6th Cir. 2001), citing United States ex rel. Compton v. Midwest Specialties, Inc., 142 F.3d 296, 302 (6th Cir. 1998). See also Shaw v. AAA Eng'g. & Drafting, Inc., 213 F.3d 519, 531 (10th Cir. 2000); United States ex rel. Oliver v. Parsons Co., 195 F.3d 457, 464-465 (9th Cir. 1999), cert. denied, 530 U.S. 1228 (2000); United States ex rel. Pickens v. Kanawha River Towing, 916 F. Supp. 702 (S.D. Ohio 1996), aff'd, 194 F.3d 1314 (6th Cir. 1999); United States v. TDC Mgmt. Corp., 24 F.3d 292, 296 (D.C. Cir. 1994); United States ex rel. Bryant v. Williams Bldg. Corp., 2001 U.S. Dist. LEXIS 4711 *24 (D. S.D. 2001); BMY-Combat Systems v. United States, 39 Fed. Cl. 109 (Fed. Cl. 1997); United States ex rel. Fallon v. Accudyne Corp., 921 F. Supp. 611 (W.D. Wis. 1995); Ab-Tech Constr., inc. v. United States, 31 Fed. Cl. 429, 434 (1994), aff'd, 57 F.3d 1084 (Fed. Cir. 1995); United States v. Incorporated Village of Island Park, 888 F. Supp. 419, 439-441 (E.D.N.Y. 1995).

submitted by providers and suppliers who were violating Medicare laws and regulations, without requiring express certification of compliance with those laws.[20]

### Liability Attaches for Seeking Funds That Provider Is Statutorily Prohibited From Receiving

Such certifications are not the only basis for determining the defendants knowingly submitted false claims to the United States. As *Thompson* recognizes, submissions for Medicare payments Defendants knew they were statutorily prohibited from receiving violate the False Claims Act.[21] Courts have affirmed this proposition time and again.[22]

This fits precisely within the letter and intent of the 1986 Amendments to the False Claims Act. The drafters squarely asserted that "claims may be false even though the services are provided as claimed if, for example, the claimant is ineligible to participate

---

[20] United States ex rel. Kneepkins v. Gambro Healthcare, Inc., 115 F. Supp. 2d 35, 43 (D. Mass. 2000); United States ex rel. Showell v. Philadelphia AFL, 2000 U.S. Dist. LEXIS 4960 (E.D. Pa. 2000); United States v. NHC Healthcare Corp., 115 F. Supp. 2d 1149. 1154 (W.D> Mo. 2000); United States ex rel. Wright v. Cleo Wallace Centers, 132 F. Supp. 2d 913, 926 (D. Col. 2000); United States ex rel. Bidani v. Lewis, 1998 U.S. Dist. LEXIS 20647 *29-30 (N.D. Ill. Jan. 3, 1999); United States ex rel. Pogue v. American Healthcorp., Inc., 914 F. Supp. 1507 (M.D. Tenn. 1996); United States ex rel. Aranda v. Community Psychiatric Centers of Oklahoma, 945 F. Supp. 1485, 1488 (W.D. Okla. 1996); United States ex rel. Sanders v. East Alabama Healthcare Authority, 953 F. Supp. 1404, 1410-1411 (M.D. Ala. 1996); United States ex rel. Roy v. Anthony, 914 F. Supp. 1504 (S.D. Ohio 1994).

[21] *Thompson*, 20 F. Supp. 2d at 1047.

[22] *E.G., United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir. 1997), *on remand*, 20 F. Supp. 2d 1017 (S.D. Tex. 1998); *United States ex rel. Bidani v. Lewis*, 264 F. Supp. 2d 612, 614 (N.D. Ill. 2003), *quoting Mikes v. Straus*, 84 F. Supp. 2d 427, 434 (S.D.N.Y. 1999); *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 32-33 (D. D.C. 2003); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. Of Am., Inc.*, 238 F. Supp. 2d 258 (D. D.C. 2002); *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 43 (D. Mass. 2000); *United States ex rel. Wright v. Cleo Wallace Centers*, 132 F. Supp. 2d 913, 926 (D. Col. 2000); *United States ex rel. Pogue v. American Healthcorp., Inc.*, 914 F. Supp. 1507 (M.D. Tenn. 1996); *United States ex rel. Aranda v. Community Psychiatric Centers of Oklahoma*, 945 F. Supp. 1485, 1488 (W.D. Okla. 1996); *United States ex rel. Sanders v. East Alabama Healthcare Authority*, 953 F. Supp. 1404 (M.D. Ala. 1996); *United States ex rel. Roy v. Anthony*, 914 F. Supp. 1504 (S.D. Ohio 1994).

in the program[.]"[23] Courts have followed Congress' wishes, holding that "the False Claims Act was intended to govern not only fraudulent acts that create a loss to the Government, but also those fraudulent acts that cause the Government to pay out sums of money to *claimants it did not intend to benefit*."[24]

Thus, a defendant's continued participation in the Medicare program constitutes an "implied certification that [it] will abide by and adhere to all statutes, rules, and regulations governing the program."[25] Each time the provider submitted a claim related to or derived from its knowing violations of these laws, it violated the implied certification of "continuing adherence to the requirements for participation in the program."[26]

As was explained in *Pogue* and *Ab-Tech*, the provider's concealment of the fact that it had violated the terms of its agreement with the United States "caused the Government to pay out funds in the mistaken belief that it was furthering the aims of the … program."[27] In essence, the United States was duped into paying entities it believed to be eligible for payment, for patients the defendant never would have obtained *but for* illegal kickbacks. This is precisely what the False Claims Act was designed to prevent.

At the outset, the focus on the financial impact to the United States is wrong as a

---

[23] S. Rep. No. 99-345, 99th Cong., 2d Sess. At 9, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274.

[24] *Pogue*, 914 F. Supp. At 1513 (*emphasis supplied*).

[25] *Pogue*, 914 F. Supp. At 1509.

[26] *Id.*, 914 F. Supp. at 1510, *quoting Ab-Tech Constr., Inc., v. United States*, 31 Fed. Cl. 429 (1994), *aff'd*, 57 F.3d 1084 (Fed. Cir. 1995). *See also BMY-Combat Systems Division of Harsco Corp. v. United States*, 38 Fed. Cl. 109, 125 (Ct. Cl. 1997).

[27] 31 Fed. Cl. at 434.

matter of law. A half-century's jurisprudence establishes that actual damages are not an element of recovery under the False Claims Act.[28]

More importantly, such arguments are fundamentally backwards, and represent a basic misunderstanding of the reimbursement provisions of federal health care programs. The relevant inquiry is not whether the Government would or would not have paid the claims (or in what amount), but whether the providers had authority to seek payment in the first place.[29] The proper focus is defendant's knowing conduct at the time the claim was submitted.[30] Medicare payment is not an entitlement, requiring the Government to prove why denied claims are exempt from such entitlement. Rather, providers receive payment only for "covered" services, as defined by Medicare law and regulations. If covered services are not provided, providers have no basis for payment.[31] A "covered service" includes, by definition, *only* services that were furnished by a supplier "that was, at the time it furnished the services, qualified to have payment made to them."[32] By law, providers engaged in illegal kickback and referral schemes never should have submitted

---

[28] *E.G., RexTrailer Co. v. United States*, 350 U.S. 148, 152-153 (1956); *Varljen*, 250 F.3d at 431; §14-3(a)(4), "Actual Damages Are Not a Necessary Element under the False Claims Act," *infra*.

[29] Following *Thompson*, the Fifth Circuit rejected these "but for" arguments. *United States v. Southland Mgmt. Corp.*, 288 F.3d 665, 6778-679 (5th Cir. 2002), *reh'g en banc granted*, 307 F.3d 352 (5th Cir. 2002), *aff'd on other grounds*, 326 F.3d 669 (5th Cir. 2003).

[30] As the *Southland* Court explained: "[T]he falsity of a claim is determined at the time of submission… Fortuities in the Government's subsequent process have no effect on the objective truth or falsity of the claimant's asserted entitlement, and should thus have no effect on the claimant's potential liability under the Act." *Southland*, 288 F.3d at 681. Moreover, if the provider violates its "continuing duty to comply with [Medicare] regulations on which the payment is conditioned," the provider [for its claims] is liable under the FCA. *United States ex rel. Augustine v. Century Health Servs, Inc.*, 289 F.3d 409, 415 (6th Cir. 2001).

[31] 42 C.F.R. § 424.5(a).

[32] 42 C.F.R. § 424.5(a)(2).

these claims in the first place.

Such providers are as liable as any other Government contractor for their concealment of its Medicare law violations while seeking Medicare money.[33] Courts routinely hold persons who deal with the Government to the letter of their agreement, without regard to whether they went through the extra step of affirmatively certifying compliance that was already required of them (and without regard to whether their noncompliance rendered the delivered product defective).[34] These holdings are equally applicable in the Mediare context:

Indeed, courts across multiple jurisdictions have applied such principles to Medicare

---

[33] The rationale of False Claims Act decisions in the Government contract arena is instructive in the Medicare context. *United States ex rel. Wright v. Cleo Wallace Centers*, 132 F. Supp. 2d 913, 926 (D. Col. 2000).

[34] *United States ex rel. Augustine v. Century Health Servs., Inc.*, 289 F.3d 409 (6th Cir. 2001); *United States ex rel. Varljen v. Cleveland Gear Co.*, 250 F.3d 426, 430 (6th Cir. 2001), *citing United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 302 (6th Cir. 1998) (upholding false claims for product which was not tested as required by contract, regardless of whether the product was defective). *See also Shaw v. AAA Eng'g. & Drafting, Inc.*, 213 F.3d 519, 531 (10th Cir. 2000) (false submission of invoices for full payment on the photography services contract knowing it had failed to comply with the contract requirements for the disposal of silver removed during film processing); *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 464, 465 (9th Cir. 1999), *cert. denied*, 530 U.S. 1228 (2000) (false claims based in the omission of cost information in violation of cost accounting regulations; *United States ex rel. Pickens v. Kanawha River Towing*, 916 F. Supp. 702 (S.D. Ohio 1996), *aff'd*, 194 F.3d 1314 (6th Cir. 1999) (seeking payment under dam construction contract without disclosing violation of contract requirements implementing Clean Water Act violates False Claims Act); *United States ex rel. Bryant v. Williams Bldg. Corp.*, 2001 U.S. Dist. LEXIS 4711*24 (D. S.D. 2001) ("Withholding [that violated contract clause requiring disclosure of discovery of asbestos], while simultaneously seeking payment under the [bathroom remodeling] contract, appears to this Court to be the very essence of a false claim"); *United States ex rel. Fallon v. Accudyne Corp.*, 921 F. Supp. 611 (W.D. Wis. 1995) (failure to perform testing required by contract while making full clam for payment of modular pack mine system components results in submission of false claim). In *United States v. Incorporated Village of Island Park*, for example, the Court held that every monthly demand for individual mortgages under a Government housing program was false because the mortgages were *fraudulently selected* for the program in violation of the contract requirements. 888 F. Supp. 419, 439-441 (E.D.N.Y. 1995). Here, patients were fraudulently selected as part of Defendants' illegal kickback scheme. In *Ab-Tech Constr., Inc. v. United States*, the Court found that submission of payment vouchers under a construction contract were made false by a contractor's failure to disclose a joint venture agreement, as was required for participation in the Small Business Administration program under which the contract was awarded. 31 Fed. Cl. 429 (1994), aff'd, 57 F.3d 1084 (Fed. Cir. 1995). The Medicare program has similarly required that suppliers do not enter into financial arrangements with third parties in return for the provision of services funded by Medicare.

claims- including those based in violations of kickback laws- when there has been no affirmative certification of compliance with Medicare laws and regulations.[35] The reasoning is simple: The Defendant violated Medicare laws in order to induce payment of Medicare funds. Such conduct violated the terms of its agreement with the United States.

These terms are as plain as the standard contractual clauses imposed on every defense contractor. Providers enter into provider agreements in order to gain a billing number by which to submit claims for payment. This agreement gives them license to participate in the Medicare and Medicaid program, while federal law and regulation lay out the program's requirements.[36] As the D.C. Circuit aptly explained: "it is the *statute* which sets forth the extent of the Government's obligation- the contract only implements

---

[35] *Augustine*, 289 F.3d 409; *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 43 (D. Mass. 2000) (claims incident to violations of Anti-Kickback law establish a claim under the False Claims Act because "[s]ubmitting a claim under the false pretense of entitlement is fraudulent"); *United States ex rel. Showell v. Philadelphia AFL*, 2000 U.S. Dist. LEXIS 4960 (E.D. Pa. 2000) ("violation of Anti-Kickback Statute may serve as basis for a claim under the False Claims Act"); *United States ex rel. Wright v. Cleo Wallace Centers*, 132 F. Supp. 2d 913, 926 (D. Col. 2000) (claims for psychiatric treatment made false by Defendant's violations of licensing requirements in relation to a swing-bed plan: "person who knowingly submits [Medicaid] claims… while not in compliance with all relevant laws… may constitute a false claim under the False Claims Act, even without an affirmative… false statement of such compliance"); *United States v. NHC Healthcare Corp.*, 115 F. Supp. 2d 1149 (W.D. Mo. 2000) (billing by nursing home while grossly violating essential agreement with United States with substandard care established False Claims Act violations); *United States ex rel. Bidani v. Lewis*, 1998 U.S. Dist. LEXIS 20647 (N.D. Ill. 1999) (relator states false claim by Part B supplier based on kickback violations for which Government would have withheld payment); *United States ex rel. Pogue v. American Healthcorp., Inc.*, 914 F. Supp. 1507 (M.D. Tenn. 1996), aff'd, 238 F. Supp. 2d 258 (D. D.C. 2002) (false claims arising from failure to disclose illegal kickbacks and self-referrals); *United States ex rel. Aranda v. Community Psychiatric Centers of Oklahoma*, 945 F. Supp. 1485 (W.D. Okla. 1996) (claims for psychiatric treatment while failing to meet quality of care standards forms the basis of False Claims Act claim); *United States ex rel. Sanders v. East Alabama Healthcare Authority*, 953 F. Supp 1404 (M.D. Ala. 1996) (knowing submission of Medicare claim by improperly licensed hospital constitutes submission of false claims); *United States ex rel. Roy v. Anthony*, 914 F. Supp. 1504 (S.D. Ohio 1994) (kickbacks in connection with submission of Medicare payments are false). *Cf. United States ex rel. Watson v. Connecticut General Life Ins. Co.*, 2004 U.S. App. LEXIS 1736 (3d. Cir. 2004); *United States ex rel. Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001); *United States ex rel. Barmak v. Sutter Corp.*, 2002 U.S. Dist. LEXIS 8509 (S.D.N.Y. 2002).

[36] The scope and extent of the rights under a provider agreement, analogous to a license or permit, are "clearly subject, however, to all applicable regulations." *In Re Psychotherapy and Counseling Center*, 195 B.R. 522, 532 (Bankr. D. D.C. 1996).

the timing and pace of the payment of that obligation."[37] Violations of Medicare laws and regulations strike at the heart of the providers' agreement with the United States, and should support False Claims Act liability.[38]

The anti-kickback provisions were enacted as part of Title XVIII of the Social Security Act in 1972.[39] They were introduced to "give a clear, loud signal to the thieves and the crooks and the abusers that we mean to call halt to their exploitation of the public purse."[40] The subsequent amendments were intended to "ensure that signal will be heard in unmistakable tones."[41]

Kickbacks are not merely an unethical practice Congress sought to deter through legislation- unrelated, as the defense bar would have it, to the payment of claims.

---

[37] *United States v. Consumer Health Services of America, Inc.*, 108 F.3d 390, 396 (D.C. Cir. 1997) (*emphasis on original*). *See also In Re Consumer Health Services of America, Inc.*, 171 B.R. 917, 920 (Bankr. D. D.C. 1994) (the required Provider Agreement together with the overall scheme under the Medicare statute and regulations... constitutes an executory contract... the right to recoupment... is in the nature of a contract right and not a statutory entitlement).

[38] False Claims Act liability "can attach if the claimant violates its continuing duty to comply with the regulations on which payment is conditioned." *Augustine*, 289 F.3d at 415. *Accord United States ex rel. Wright v. Cleo Wallace Ctrs.*, 132 F. Supp. 2d 913, 926 (D. Colo. 2000) ("[A] person who knowingly submits claims to the government for the purpose of acquiring federal Medicaid funds while not in compliance with all relevant laws, rules and regulations may constitute a false claim under the FCA, even without an affirmative or express false statement of such compliance."). *But see United States ex rel. Joslin v. Community Home Health of Maryland, Inc.*, 984 F. Supp. 374, 385 (D. Md. 1997) (emphasis in original) ("The relevant statute and regulation simply state that such compliance is a condition of participation in the Medicare program, but no evidence has been presented suggesting that *certification* of such compliance is a condition to *payment*, the *sine qua non* of FCA liability."); *United States ex rel. Cooper v. Gentiva Health Servs.*, 2003 U.S. Dist. LEXIS 20690 (W.D. Pa. 2003) (application for billing privileges involves obligations for participation, not payment); *Lum v. Vision Service Plan*, 104 F. Supp. 2d 1237, 1241-1242 (D Haw. 2000) (citations omitted) ("It is not at all clear that certification was a prerequisite for payment to VSP, but, even if it was, a mere regulatory violation would not give rise to a viable False Claims Act action. There are administrative and other remedies for regulatory violations. Absent express false certifications upon which funding is conditioned, the False Claims Act provides no remedy.")

[39] Pub. L. 92-603, 86 Stat. 1329 (October 30, 1972). They were recodified in Title XI as part of 1987 Amendments to the Social Security Act, called the Medicare and Medicaid Protection Act of 1987. Pub. L. No. 100-93, 100 Stat 680 (August 18, 1987).

[40] 123 Cong. Rec. 31767 (September 30, 1977) (Remarks of Sen. Talmadge).

[41] *Id.* (Remarks of Sen. Talmadge regarding 1977 Amendments).

Kickback legislation was motivated by the basic recognition that claims submitted

pursuant to kickbacks lead to the misuse of Medicare funds and the rising cost of the

program. The legislative history is straightforward on this point:

> Existing law provides specific penalties under the Medicare and Medicaid
> programs for certain practices that have long been regarded by professional
> organizations as unethical, which are unlawful in some jurisdictions, and
> *which contribute significantly to the cost of the programs.* Such practices
> [include the] submission of false claims or the soliciting, offering, or
> acceptance of kickbacks or bribes...[42]

> In whatever form it is found, *fraud in these health care financing
> programs... cheats taxpayers who must ultimately bear the financial
> burden* of misuse of funds in any Government-sponsored program.[43]
> [*Kickbacks*] are widespread in Medicaid... [and are a] pervasive practice
> which *picks the taxpayer's pocket.*[44]

One of the reasons for the rising costs, resulting from illegal kickbacks is their

relationship to unnecessary claims. In fact, in 1977, a Special Committee was convened

to examine just this issue, and what it found convinced them that aggressive action was

necessary to stop this kind of abuse *before* it led to the submission of claims. As the

Committee's Report summarized:

> This report deals with what must be the most commonly occurring scheme
> to defraud the Medicaid program. The word "kickbacks" connotes a
> practice that has been found to some degree in every aspect of the Medicaid
> system. *Such rebates have the effect of increasing the cost of the Medicaid*

---

[42] H. Rep. 95-393, 95th Cong., 1st Sess. at 52-53, *reprinted in*, 1977 U.S.C.C.A.N. 3039, 3055 *see also* S. Rep. 95-453, 95th Cong., 1st Sess. at 11 (*emphasis added*).

[43] H. Rep. 95-393, 95th Cong., 1st Sess. at 44, *reprinted in*, 1977 U.S.C.C.A.N. 3039, 3047 (*emphasis added*).

[44] S. Rep. 95-320, *Kickbacks Among Medicaid Providers, A Report of the Special Committee on Aging* 95th Cong., 1st Sess. at 28 (June 30, 1977) (*emphasis added*).

*program. They undermine the quality of services which are offered since operators become more concerned with rebates than with care…*[45]

### Civil Penalties

In 1986, the penalty provision of the FCA was amended to increase the amount of each penalty to not less that $5,000 and not more than $10,000.[46] As a result of an administrative increase effectuated in 1999, the penalty range for false claims made on or after September 29, 1999, is $5,500 to $11,000.[47]

On November 2, 2015, President Obama signed into law the Federal Civil Penalties Inflation Act of 2015.[48] The Act requires agencies to adjust the level of civil monetary penalties with an initial "catch-up" adjustment through an interim final rulemaking and to make subsequent annual adjustments for inflation.[49] Agencies were to publish their interim final rules by July 1, 2016, and the new penalty levels took effect no later than August 1, 2016.[50]

On June 30, 2016, the Department of Justice published the new post-adjustment

---

[45] S. Rep. 95-320, *Kickbacks Among Medicaid Providers, A Report of the Special Committee on Aging* 95th Cong., 1st Sess. at 2 (June 30, 1977) (*emphasis added*). Providers described to the Committee a "hungry-for-business" mentality driving kickbacks. S. Rep. 95-320, *Kickbacks Among Medicaid Providers, A Report of the Special Committee on Aging* 95th Cong., 1st Sess. at 8 (June 30, 1977). Kickbacks can also lead to increased costs when providers "make up the difference" for monies spent on kickbacks with increased rates: A pharmacist reported to the Committee, "You would be absolutely amazed at the amount of Government money being sopped up by these extra billings." S. Rep. 95-320, *Kickbacks Among Medicaid Providers, A Report of the Special Committee on Aging* 95th Cong., 1st Sess. at 12 (June 30, 1977).
[46] 31 U.S.C. §3729(a)(1). These "civil penalties" were called "forfeitures" prior to 1986.
[47] 28 C.F.R. §85.3(a)(9).
[48] Section 701 of the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, 129 Stat. 584 (Nov. 2, 2015). This section is now codified at 28 U.S.C. §2461 note. *See* Memorandum from Shaun Donovan, Executive Director, Office of Management and Budget, to Heads of Executive Departments and Agencies, Implementation of the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, No. M-16-06 (Feb. 25, 2016).
[49] *Id.*
[50] *Id.*

minimum and maximum FCA penalties as $10,781 and $21,563, respectively.[51] These amounts apply to penalties assessed after August 1, 2016 for violations that occurred after November 2, 2015, the date of the Act.[52]

On February 3, 2017, the Department of Justice announced that, effective immediately, the minimum per-claim penalty for FCA violations would increase to $10,957, and the maximum per claim penalty would increase to $21,916.[53] Again, these amounts apply to penalties assessed after February 3, 2017 to violations that occurred after November 2, 2015, the date on which the Act was signed.[54]

The following table illustrates the annual changes to the amount of the FCA's civil penalties.

| DATE PENALTIES ASSESSED | MINIMUM PENALTY | MAXIMUM PENALTY |
|---|---|---|
| Assessments made anytime to the present for violations from 9/29/1999 to before 11/2/2015; *and* Assessments made before 8/1/2016 (for violations after 11/2/2015)[55] | $5,500 | $11,000 |
| 8/2/2016 to 2/3/2017 (for violations after 11/2/2015)[56] | $10,781 | $21,563 |

---

[51] Civil Monetary Penalty Inflation Adjustment, 81 Fed. Reg. 42, 491, 42, 494 (June 30, 2016).
[52] *Id.* at 42, 498.
[53] Civil Monetary Penalty Inflation Adjustment for 2017, 82 Fed. Reg. 9131, 9133 (Feb. 3, 2017).
[54] *Id.* at 9132.
[55] 28 C.F.R. §85.3(a)(9); 81 Fed. Reg. at 42,494, 42,498.
[56] 28 C.F.R. §85.5; 81 Fed. Reg. at 42,494, 42,498.

| | | |
|---|---|---|
| 2/4/2017 to 1/15/2018 (for violations after 11/2/2015)[57] | $10,957 | $21,916 |

Therefore, the Defendants, each of them, should be assessed civil penalties for each false claim submitted to the government for payment. All of these occurrences were after November 2, 2015, which means that the minimum of $10,957 per occurrence, and a maximum of $21,916 per occurrence, of false claims submitted for payment should be assessed.

### *Materiality*

Perhaps the earliest statement of the "implied certification" theory comes from the Federal Circuit. In *Ab-Tech Construction v. United States*,[58] a small, minority-owned construction company was awarded a contract by the Small Business Administration (SBA) for the construction of a data processing facility for the U.S. Army Corps of Engineers. As a condition of the contract award, Ab-Tech signed a "Statement of Cooperation" promising to comply with the SBA's requirements and regulations for continuing eligibility to participate in the SBA program- a program meant to advantage small, minority owned businesses.

One of the regulations allowed the SBA to terminate Ab-Tech's participation in

---

[57] 28 C.F.R. §85.5; 82 Fed. Reg. at 9131-32, 9133.
[58] 31 Fed. Cl. 429 (Fed. Cir. 1994). *See also* James B. Helmer, Jr. & Robert M. Rice, *The False Claims Act and Implied Certification: An Update on the State of the Law*, 34 False Claims Act & *Qui Tam* Q. Rev. 51 (2004).

the program if it entered into a joint venture agreement without prior SBA approval.
Despite the regulation, Ab-Tech di in fact forge a joint venture without notifying the
SBA. This conduct violated the SBA regulation, yet Ab-Tech continued to submit claims
for progress payments.

In subsequently finding Ab-Tech liable under the FCA, the court found it
irrelevant that Ab-Tech was not required to explicitly recertify continuing adherence to
all SBA regulations when submitting progress payments. The claims were false
nonetheless:

> The payment vouchers represented an implied certification by
> Ab-Tech of its continuing adherence to the requirements for
> participation in the [SBA] program. Therefore, by deliberately
> withholding from SBA knowledge of the prohibited contract
> arrangement... Ab-Tech not only dishonored the terms of its
> agreement with that agency but, more importantly, caused the
> Government to pay out funds in the mistaken belief that it was
> furthering the aims of the [SBA] program. In short, the Government
> was duped by Ab-Tech's active concealment of a fact vital to the
> integrity of that program. The withholding of such information-
> information critical to the decision to pay- is the essence of a false claim[59].

---

[59] *Ab-Tech Constr.*, 31 Fed. Cl. At 434. The concept of "implied certification" honors the broad purpose of the FCA, which, as the U.S. Supreme Court long ago recognized, is designed to reach "all fraudulent attempts to cause the Government to pay out sums of money." *Id.* at 433 (citing *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968)).

The district court in *United States ex rel. Pickens v. Kanawha River Towing*[60] explained the concept of implied certification succinctly: "[A] contractor who knowingly fails to perform a material requirement of its contract... yet seeks or receives payment as if it had fully performed without disclosing the non-performance, has presented a false claim to the Government man may be liable therefore."[61] In other words, a demand for payment by a government contractor constitutes an implicit representation that the contractor has complied with the requirements of the government contract.[62]

A false claim exists where a contractor makes claims for full payment, but withholds from the government information about noncompliance with required inspection specifications that were critical to the decision to pay for the items purchased. It is not necessary that there be express false claims on the government's DD250 forms, because implied representations fall into the category of acts that constitute false of fraudulent claims. Deliberate withholding of information is sufficient to prove an FCA violation.[63]

A request for payment under the terms of the contract is a representation of

---

[60] 916 F. Supp. 702 (S.D. Ohio 1996), *aff'd on other grounds*, 194 F.3d 1314 (6th Cir. 1999).

[61] 916 F. Supp. At 707. See *United States ex rel. Fallon v. Accudyne Corp.*, 921 F. Supp. 611, 627 (W.D. Wis. 1995). See also *United States v. TDC Mgmt. Corp.*, 24 F.3d 292, 296 (D.C. Cir. 1994) (liability could attach as matter of law under FCA as result of failure to disclose material noncompliance); *Imperial Meat v. United States*, 316 F.2d 435 (10th Cir. 1963) (finding contractor criminally liable for providing inferior grade of meat notwithstanding that its invoice made no representation concerning grade of meat).

[62] *Pickens*, 916 F. Supp. At 707; *Fallon*, 921 F. Supp. At 627. *But see United States ex rel. Joslin v. Community Home Health*, 984 F. Supp. 374, 375-78 (D. Md. 1997).

[63] *BMY-Combat Sys. Div. of Harco v. United States*, 38 Fed. Cl. 109, 124 (1997); *Sterling Millwrights v. United States*, 26 Cl. Ct 44, 95 (1992).

compliance with the contract terms- that is, the very act of submitting a claim for

payment carries with it assurances, whether explicitly given or not, that the claimant has

complied with all conditions associated with the payment sought[64]. Thus, although

express certifications may be powerful evidence of both falsity and knowledge, they are

not always needed to state a claim under the FCA. Often termed "implied false claims,"

such violations of the FCA must be actionable in order to protect the public coffers from

some of the most outrageous and intentional false billing schemes. For the purposes of

the Act, an implied representation on an invoice that work has been completed pursuant

to the contract requirements may constitute a false claim for payment[65]. In order to show

that an implied representation violates the FCA, there must be proof by a preponderance

of the evidence that the contractor knowingly withheld information[66]. A false certification

of compliance with a statute, regulation, or guideline, whether express or implied, may

violate the Act.[67] However, courts distinguish between regulations, statutes, and

guidelines that serve as conditions of payment versus conditions of participation[68]. If a

---

[64] *United States v. Rivera*, 55 F.3d 703, 710 (1st Cir. 1995).

[65] *United States ex rel. Augustine v. Century Health Servs.*, 289 F3d 409 (6th Cir. 2002); *BMY-Combat Sys. Div. of Harsco Corp. v. United States*, 38 Fed. Cl. 109, 124 (Cl. Ct. 1997) (citing *Ab-Tech Constr., Inc. v. United States*, 31 Fed. Cl. 429, 433-34 (1994), *aff'd*, 57 F.3d 1084 (Fed. Cir. 1995); *Daff v. United States*, 31 Fed. Cl. 682, 695 (1994), *aff'd* 8 F.3d 1566 (Fed. Cir. 1996)).

[66] *BMY-Combat Sys. Div. of Harsco Corp. v. United States*, 38 Fed. Cl. 109, 124 (Cl. Ct. 1997) (citing *Daff v. United States*, 31 Fed. Cl. 682, 688-89 (1994); *Sterling Millwrights v. United States*, 26 Cl. Ct. 49, 95 (1992)).

[67] *Augustine*, 289 F.3d at 416; *United States ex rel. Mikes v Straus*, 274 F.3d 687, 697 (2d Cir. 2001), *abrogated by Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016); *Shaw v. AAA Eng'g & Drafting*, 213 F.3d 519, 531 (10th Cir. 2000); *United States ex rel. Watson v. Connecticut General Life Ins. Co.*, 2003 U.S. Dist. LEXIS 2054, at *42-43 (E.D. Pa. Feb. 11, 2003).

[68] *United States ex rel. Wilkins v. United Health Grp.*, 659 F.3d 295, 308-09 (3d Cir. 2011) (citing *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001), abrogated by Universal Health Servs., Inc. v. United States ex rel. Escobar, 136 S. Ct. 1989 (2016)); *United States ex rel. Conner v. Salina Reg'l Health Ctr.*, 543 F.3d 1211, 1220 (10th Cir. 2008).

regulation is only a condition of participation, courts were unlikely to find any implied certification. As noted by the Tenth Circuit, the difference between a participation condition and a payment condition is that violation of the former may result in removal from the government program, whereas violation of the latter might cause the government to refuse payment[69].

But the debate over conditions of participation being required for an implied certification claim became a matter of historical note only with the Supreme Court's *Escobar* decision eschewing such analysis.

On June 16, 2016, the U.S. Supreme Court issued a unanimous pronouncement on the FCA in *Universal Health Services, Inc. v. United States ex rel. Escobar*[70]. The Court, in an opinion crafted by Justice Thomas, found that implied certification, in certain circumstances, can be a basis for FCA liability when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose its noncompliance with a statutory, regulatory, or contractual requirement, such that the omission renders the representation misleading[71]. Although the Court got it right in deciding that implied certification is a viable theory of liability under the FCA, it left some waters muddy by declining to resolve the full scope of this liability theory. The Court vacated and remanded the First Circuit's decision because the latter's

---

[69] *Conner*, 543 F.3d at 1220.
[70] 136 S. Ct. 1989 (2016).
[71] *Id.* at 1995. This holding overturned Second and Seventh Circuit decisions. *United States ex rel. Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001); *United States ex rel. Nelson v. Sanford-Brown*, 788 F.3d 696 (7th Cir. 2015).

interpretation of Section 3729(a)(1)(A)'s materiality standard differed from the Court's newly minted interpretation of that provision[72].

The relators in *Escobar* were the mother and stepfather of Yarushka Rivers, a girl who developed behavioral problems in 2004[73]. Rivers received counseling services as a Medicaid beneficiary at Arbour Counseling Services, a mental health facility in Massachusetts owned and operated by a subsidiary of the petitioner Universal Health Services[74]. A total of five medical professionals treated Rivers while she was a patient of the facility[75]. In May 2009, Rivers had an adverse reaction to medication prescribed to her to treat bipolar disorder[76]. She later suffered two seizures and died in October 2009, at the age of 17[77].

It was later revealed to Rivers' mother and stepfather that few of Arbour's employees were in fact licensed to provide mental health counseling, and that there was minimal supervision of those employees[78]. Of the five 'professionals' who treated Rivers, only one was properly licensed[79]. For example, the practitioners who diagnosed Rivers as bipolar, who claimed she was a psychologist with a Ph.D., actually got her degree from

---

[72] *Escobar*, 136 S. Ct. at 1996. On remand, the First Circuit determined that the relator had properly pled materiality and remanded the case to the trial court. *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103 (1st Cir. 2016).
[73] *Escobar*, 136 S. Ct. at 1996-97.
[74] *Id.*
[75] Universal Health Servs., Inc. v. United States ex rel. Escobar, 136 S. Ct. 1989 (2016).
[76] *Id.*
[77] *Id.* at 1997.
[78] *Id.*
[79] *Id.*

an unaccredited Internet college, and her application to be licensed by the Commonwealth of Massachusetts was denied[80]. The practitioner who prescribed medication to Rivers, who was held out as a psychiatrist, was actually a nurse who had no authority to prescribe medication[81]. All told, 23 of Arbour's employees lacked licenses to provide mental health services, yet Arbour represented to the Massachusetts Medicaid program that it did have properly licensed personnel and proper supervision requirements for its staff when it submitted claims for payment to the program[82].

The overwhelming majority of courts that have addressed the implied certification theory of liability required that, in order for a claim to be actionable under the theory, the statute, regulation, or contractual term violated must have been a condition of payment. The Supreme Court changed that requirement in several respects.

First, no longer do the legal requirements violated need to be expressly designated as conditions of payment[83]. Instead, failure to comply with such requirements that are not expressly conditions of payment can result in liability[84]. Second, an express condition of payment will not always result in liability. Instead, courts are to look to whether the defendant violated a requirement that it knew was material to the government's decision to pay[85]. Although the Court did not resolve the full scope of the implied certification

---

[80] *Escobar*, 136 S. Ct. at 1997.
[81] *Id.*
[82] *Id.*
[83] *Id.* at 1996.
[84] *Id.*
[85] *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

Page | 27

theory of liability, it created a two-part test for determining when misleading half-truths make a claim false:

> (1) The claim must not merely request payment, but also must make specific representations about the goods or services provided; and
> (2) The defendant's failure to disclose noncompliance with the material statutory, regulatory, or contractual requirements makes those representations misleading half-truths[86].

The Supreme Court questioned whether a defendant is liable under the implied certification theory only if it fails to disclose the violation of a contractual, statutory, or regulatory provision that the government expressly designated a condition of payment[87]. The Court answered the question in the negative, but again, in doing so, it put the concept of materiality in a state of flux.

The Court noted that neither the text of Section 3729(a)(1)(A) nor the common law meaning of "fraud" limits liability only to those claims involving misrepresentations or fraud in violation of express conditions of payment[88]. The Court also found that the FCA's materiality requirement did not support the defendant's argument that statutory, regulatory, and contractual requirements are not automatically material because they are labelled as conditions of payment[89]. The *scienter* requirement in Section 3729(a)(1)(A) also did not support the defendant's argument, because a defendant can have actual

---

[86] *Id.* at 2001.
[87] *Id.*
[88] *Id.*
[89] *Id.*

Page | 28

knowledge that a condition is material, without the government expressly calling it a condition of payment[90].

At first blush, it seems that the Court engrafted into the FCA all of the other elements of common law fraud, which would include damages. However, that is not the case; as the *Neder v. United States*[91] case cited by the Court specifically cautioned (although a point not referenced in the *Escobar* decision), "the common law requirements of 'justifiable reliance' and 'damages,'… plainly have no place in the federal fraud statutes."[92] In addition, the Court noted that reliance and damages are incompatible with such fraud statutes because they prohibit not just completed fraud, but also schemes to defraud[93]. Like the mail fraud statute at issue in *Neder*, the FCA also prohibits attempts to defraud the government, and as such, reliance and damages need not be shown. The plain language of the FCA bears this out, as it imposes liability on one who presents or causes the presentment of a false claim that causes damages to the government.

Another overreaching statement in the opinion is Justice Thomas' reliance on *Vermont Agency of Natural Resources v. United States ex rel. Stevens*[94] in referring to liability under the Act being "essentially punitive in nature."[95] But such a statement ignores that the Supreme Court explicitly reviewed the *Stevens* holding three years after

---

[90] *Escobar*, 136 S. Ct. at 2001.
[91] 527 U.S. 1 (1999).
[92] *Id.* at 24-25 (citing *United States v. Stewart*, 872 F.2d 957, 960 (10th Cir. 1989)).
[93] *Id.* at 25.
[94] 529 U.S. 765 (2000).
[95] *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016) (citing *Vermont Agency of Nat. Res. V. United States ex re. Stevens*, 529 U.S. 765, 784 (2000).

deciding it and championed the remedial nature of the Act.[96]

In the end, courts have generally embraced the theory of "implied certification" as a needed tool to reach beyond express falsehoods to examine whether a sufficient nexus exists between payment and adherence to the particular contract term that has been violated by a defendant. Some courts, unfortunately, take a conservative approach- for example, by finding that an invoice "impliedly certifies" compliance with only those contract terms expressly identified in the contract as preconditions to payment.[97] However, those courts that required express identification of such terms have now been overruled by the Supreme Court's *Escobar* decision. In this case we have specific examples of individual false submissions, as in this case.

Applying the post-*Escobar* implied certification analysis, a court noted that the Supreme Court refused to "'resolve whether all claims for payment implicitly represent

---

[96] *Cook County v. United States ex re. Chandler*, 538 U.S. 119 (2003)

[97] *United States ex rel. Graves v. ITT Educ. Servs.*, 284 F. Supp. 2d 487, 502 (S.D. Tex. 2003), *aff'd*, 111 F. App'x 296 (5th Cir. 2004) (citing *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 702 (2d Cir. 2001), *abrogated by Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016) (defendant operator of technical colleges participated in government financial assistance program and violated associated regulation that prohibited incentive payments to its recruiters based on successful enrollment; court found that claims for federal funds were not "false claims" because "the regulation that Relators allege was violated is a condition of eligibility to participate in the program, not an express condition of payment of specific claims or retention of payments."); *United States ex rel. Coppock v. Northrop Grumman Corp.*, 2003 U.S. Dist. LEXIS 12626, at *40 (N.D. Tex. July 22, 2003) (citing *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 675-77 (5th. Cir. 2003) (en banc) (defendant rented property from the government and specifically promised in its lease contracts to comply with environmental laws; despite defendant violating those laws, court refused to find that the defendant impliedly certified compliance with those laws because lease contract did not expressly state that continued use of property depended on compliance with environmental laws or that "failure to certify statutory or contractual compliance would *necessarily* have resulted in termination of the leases."); *United States ex rel. King v. F.E. Moran, Inc.*, 2002 U.S. Dist. LEXIS 16277 (N.D. Ill. Aug. 29, 2002)). Although these cases at least recognize the theory of "implied certification," the courts all but ignore that there is an obvious and necessary nexus between payment under federal contracts and compliance with the requirements of those very contracts.

that the billing party is entitled to payment.'"[98] However, prior to *Escobar*, the D.C. Circuit did address this issue in *United States v. Science Applications International Corp.*[99] and found am implied false certification need not include express contractual language specifically linking compliance to eligibility for payment.[100] Instead, all that must be shown is that the contractor withheld information about its noncompliance with material contractual requirements.[101] Since the Supreme Court did not address that issue, the standard announced in *Science Applications* survived the *Escobar* decision.[102] As such, in the post-Escobar Landis case,[103] the court denied the defendants' summary judgment motion since the government provided evidence that Lance Armstrong withheld information about his team's doping and that the anti-doping provisions of the sponsorship agreements were material to the decision to continue the sponsorship and to make payments.[104]

### *Kickbacks*

Here we have a unique situation. We have four legal entities, all of which have the same identical financial interest, Dr. Shakeel. The clinics receive calls for COVID-19 tests. The clinic makes referrals to Dr. Shakeel for the work, even though the work is

---

[98] *United States ex rel. Landis v. Tailwind Sports Corp.*, 2017 WL 573470, at *11 (D.D.C. Feb. 13, 2017) (quoting *Escobar*, 136 S. Ct. 1989, 200 (2016)).
[99] 626 F.3d 1257 (D.C. Cir. 2010).
[100] *Landis*, 2017 WL 573470, at *11 (quoting *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257 (D.C. Cir. 2010)).
[101] *Id.*
[102] *Id.* (*citing United States v. Dynamic Visions, Inc.*, 2016 WL 6208349, at *9 (D.D.C. Oct. 24, 2016)).
[103] *United States ex rel. Landis v. Tailwind Sports Corp.*, 2017 WL 573470 (D.D.C. Feb. 13, 2017).
[104] *Id.* at *12.

fraudulently performed by clinic personnel and is billed as if Dr. Shakeel himself performed the work, thus he receives payment for work he did not perform.

First off, this is self- referral, as Dr. Shakeel is causing the referrals to be made to himself, because he owns both the clinics and his personal practice, and receives the economic benefit of both from any single transaction. Second, Dr. Shakeel receives a renumeration from any referral that is made by the clinic, just as the clinic receives a renumeration for giving the referral to Dr. Shakeel. Ultimately, the maximum benefit will escheat to the owner, Dr. Shakeel.

On March 23, 2010, Congress codified the Affordable Care Act. The definitions of Federal Healthcare Programs, renumeration, directly and indirectly, as well as criminalized certain acts by making them violations of the False Claims Act. The statute makes it clear in 31 U.S. Code § 3729 (a)(1)(A-G), that anyone found guilty of violating the False Claims Act is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person. Therefore, the Defendant and each of them being guilty of self-referrals and kickbacks are liable to the United States as stated.

## Oklahoma Medicaid False Claims Act

Medicaid was enacted by Congress on July 30, 1965, under Title XIX of the Social

Security Act, as a health coverage program intended to provide medical benefits to those who could not afford necessary medical expenses.

Oklahoma Medicaid is a jointly funded program by the federal and state government and is administered by the Oklahoma Health Care Authority ("**OHCA**"), an Oklahoma State agency responsible for receiving, reviewing, and paying properly compliant Medicaid claims submitted by health care providers who are properly qualified, credentialed, contracted and eligible to receive payment.

The Oklahoma Medicaid False Claims Act ("**OKFCA**"; 63 O.S. § 5053 *et seq.*)[105] provides, *inter alia*, that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or who knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid is liable to the State of Oklahoma for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages the State sustains. 63 O.S. § 5053.1.

"Knowing" and "knowingly" mean that a person, with respect to information, (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and, no proof of specific intent to defraud is necessary. 63 O.S. § 5053.1.

Because Medicaid is funding in part by the Federal Government, a claim for

---

[105]     The 2016 Oklahoma Legislature amended the OKFCA in effort to better conform the OKFCA to the FCA. The amended OKFCA became effective on November 1, 2016.  63 O.S. § 5053 *et seq.*

payment made to Medicaid causes a claim to be made to the Federal Government.

Violating or falsely certifying compliance with the AKS, Stark, the FCA, or the OKFCA is a material consideration of FHCP's to making payment.

### Retaliation Under The Federal False Claims Act

The FCA provides, *inter alia*, employees, contractors, and/or agents who are discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against because of lawful acts done in furtherance of an action under or to stop violations of the FCA are entitled to relief for such damages, including reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. 31 U.S.C. § 3730(h).

### V. CLAIMS

### COUNT 1: False Claims Submitted Under 31 U.S.C. § 3729(a)(1)(A)

20.   The FCA provides liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. §3729(a)(l)(A).

21.   As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly presented or caused to be presented false or fraudulent claims to Federal and State healthcare programs for

payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

22.    The United States Government, or its authorized agent, unaware of the improper supervision orchestrated by Defendants, paid the false and/or fraudulent claims. A violation of § 3729(a)(1)(A) is material to the Government's decision to make payment.

24.    Further, the Defendants knew at the time of submission of the claim for payment that the claimant did not qualify to receive payments, but Defendants submitted the claims as if they were valid claims and they were eligible to be paid by the government.

26.    By virtue of the false or fraudulent claims Defendants knowingly caused to be presented, the United States Government has suffered substantial monetary damages. That Defendant authorized the submission of the claims by various Defendant companies, as well as the performance of false and fraudulent services, contrary to both state and federal law, with the intent that the false claims be paid by the federal government.

## COUNT 2: USE OF FALSE RECORDS UNDER 31 U.S.C. § 3729 (a)(1)(B)

27.    The Defendants, all of them, used false and/or fraudulent documents to get the false claims submitted and paid by the federal government. For purposes of clarity, it is necessary to identify the financial relationship between the Defendants, the individual doctor and the PLLC's. The PLLC's are owned by the individual doctor, all of which

are jointly and severally liable for the violations of FCA.

## **COUNT 3: CONSPIRACY UNDER 31 U.S.C. § 3729 (a)(1)(A)**

30.     The Defendant doctor and his subsidiaries agreed and conspired to obtain

money from the federal government for which neither were entitled to, or for which

neither had provided medically necessary medical services.

31.     That all Defendants committed overt acts by and through their agents,

employees, and representatives which include but were not limited to:

(a) Submitting false claims to the government;

(b) Ordering employees to file unlawful documents as if they were legal

medical records necessary for the purposes;

(c) Keeping records of medical charts issued by non-doctor employees.

(d) Receiving and maintaining funds fraudulently obtained from the federal and

state government programs, as well as concealing and distributing said funds.

(e) Used, sent, and received communications regarding the conspiracy and the

orders to act in the furtherance of the conspiracy by telephone, email, and by virtue of

the internet.

(f) Mailed, by US Mail and other means, false documents and prescriptions,

including prescriptions that were not medically necessary.

## COUNT 4: RETENTION OF OVERPAYMENT OF FUNDS UNDER 31 U.S.C. §

## 3729(a)(1)(G)

32.     None of the Defendants reported the money that they collected as a result of the submission of false claims for payment, nor did either repay the amounts they wrongfully received, contrary to 31 USC 3729(a)(1)(G) and 42 USC 1320 a-7b(b).

33.     The United States Government, or its authorized agent, unaware of the improper supervision orchestrated by Defendants, paid the false and/or fraudulent claims. A violation of§ 3729(a)(l)(A) is material to the Government's decision to make payment.

35.     Further, the Defendants knew at the time of submission of the claim for payment that the claimant did not qualify to receive payments, but Defendants submitted the claims as if they were valid claims and they were eligible to be paid by the government.

36.     Further, they retained the money received. Beyond the time allowed for self-reporting and at all times, The Defendants, their agents, supervisors, and management knew these were not valid, lawful claims and should not have been submitted as if they were. The Defendants took the money for services not provided and services that were contrary to certification and kept it, all the while knowing that to do so was beyond lawful limits and unlawful retention of funds that they were unqualified to receive.

37.     By virtue of the false or fraudulent claims Defendants knowingly caused to be presented, and knowingly retained said funds, the United States Government has suffered substantial monetary damages, harm, and did not receive what it bargained for.

## Count 5:  Retaliation Under 31 U.S.C. § 3730(h)

38.     The allegations set forth above are hereby incorporated as if fully set forth herein.

39.     When the Relator complained about the policy of having persons other than the doctor use his sign-in on the computer and falsify the patient records, the doctor and staff began a program of harassment and retaliation. The more she complained, the more she was harassed because of her expressing her belief that the doctor's practice was unlawful.

40.     Under the FCA Relator is entitled to relief for such damages, including reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained from the discrimination, including litigation costs and reasonable attorneys' fees.

## Count 6:  Retaliation Under 63 O.S. § 5053.5

41.     The allegations set forth above are hereby incorporated as if fully set forth herein.

42.     When the Relator complained about the policy of having persons other than the doctor use his sign-in on the computer and falsify the patient records, the doctor and staff began a program of harassment and retaliation. The more she complained, the more she was harassed because of her expressing her belief that the doctor's practice was unlawful.

43.     Under the OKFCA Relator is entitled to relief for such damages, including

reinstatement, two times the amount of back pay, interest on the back pay, and

compensation for any special damages sustained from the discrimination, including

litigation costs and reasonable attorneys' fees.

### Count 7:  False Claims Submitted Under 63 OS 5053 et seq.

44.     The O K F C A , 6 3   O S   5 0 5 3 , provides liability for any person who

"knowingly presents, or causes to be presented, a false or fraudulent claim for payment

or approval."

45.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts

alleged herein the Defendants have knowingly presented or caused to be presented

false or fraudulent claims to Federal and State healthcare programs for payment or

approval in violation of 63 OS 5053 et seq.

46.     The United States Government, or its authorized agent, unaware of the improper

supervision orchestrated by Defendants, paid the false and/or fraudulent claims. A

violation of 63 OS 5053 et seq is material to the State's decision to make payment.

47.     Further, the Defendants knew at the time of submission of the claim for payment

that the claimant did not qualify to receive payments, but Defendants submitted the

claims as if they were valid claims and they were eligible to be paid by the government.

48.     By virtue of the false or fraudulent claims Defendants knowingly caused to be

presented, the State of Oklahoma has suffered substantial monetary damages. That

Defendant authorized the submission of the claims by various Defendant companies, as well as the performance of false and fraudulent services, contrary to both state and federal law, with the intent that the false claims be paid by the federal government.

## VI. TRIAL BY JURY

49.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relator hereby demands trial by jury.

**WHEREFORE,** Relator, on behalf of himself and the United States, prays that the Court enter judgment against Defendants in an amount equal to the amount determined pursuant to the Federal False Claims Act and the Anti-Kickback Statute as damages the United States sustained, plus civil penalties for each and every violation as prescribed by statute; that the Relator be awarded an amount that the Court decides pursuant to the Federal False Claims Act and the Anti-Kickback Statute as reasonable for collecting such civil penalties and damages; and that the Relator be awarded all costs and expenses incurred, including reasonable attorney's fees; and other such relief a s the court s h o u l d deem appropriate.

Respectfully submitted,

GAYLON C.HAYES
Oklahoma Bar 14492; Tx Bar 24071384
6805 South Western Ave. Suite 500
Oklahoma City, OK 73139
Telephone: 405-616-5045
Facsimile: 405-616-5062
gaylon@hhhlawfirm.com
whitney@hhhlawfirm.com
*Attorney for Relator*

Page | 40

LIST OF PATIENT INFORMATION REDACTED TO PROTECT THE PERSONAL

INFORMATION OF PATIENTS PURSUANT TO FEDERAL LAW, AND ONLY TO

BE RELEASED TO PARTIES UNDER A PROTECTIVE ORDER.



PLAINTIFF'S
EXHIBIT
_1_

LIST OF PATIENT INFORMATION REDACTED TO PROTECT THE PERSONAL

INFORMATION OF PATIENTS PURSUANT TO FEDERAL LAW, AND ONLY TO

BE RELEASED TO PARTIES UNDER A PROTECTIVE ORDER.



PLAINTIFF'S
EXHIBIT

2

PENGAD 800-631-6989